UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ULYSSES WHITE,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    04-CV-744S

J. BAUER, D. DeLORENZIO, M. SEDAR,
Y. FISCHER, MR. SCHMIDT and JOHN DOE,[1]

                    Defendants.[2]

# I. INTRODUCTION

In this action, pro se Plaintiff Ulysses White alleges pursuant to 42 U.S.C. § 1983 that Defendants violated his Eighth Amendment rights by denying him adequate medical treatment and using excessive force against him while he was an inmate in the custody of the New York State Department of Correctional Services ("DOCS").  Presently before this Court is Defendants' Motion for Summary Judgment.[3]  For the following reasons, Defendants' motion is granted in part and denied in part, and Defendants John Doe, R.N. and D. DiRienzo, R.N. are dismissed from this case.

---

[1]Plaintiff has not identified or served the John Doe, R.N. defendant, nor has he set forth any reasons why John Doe, R.N. should not be dismissed.  In any event, because John Doe, R.N. is alleged to have engaged in conduct similar to either those defendants named in Plaintiff's denial of medical care claim who have already been dismissed or who are parties to this motion, this Court will dismiss Plaintiff's claims against John Doe, R.N.

[2]The names of the defendants are incorrect in the caption of the case and the Complaint.  The defendants' correct names, which will be used by this Court hereafter, are as follows: John Bauers, M.D.; D. DiRienzo, R.N.; Michael Sedar, R.N.; Yvonne Fisher, R.N.; and Officer Schwedt.

[3]In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law; a Rule 56 Statement of Undisputed Facts; the Declaration of Stephen Gawlik, with attached exhibits; the Declaration of John Bauers, M.D., with attached exhibits; the Declaration of Michael Sedar, R.N., with attached exhibits; and the Declaration of Yvonne Fisher, R.N.  Plaintiff filed three submissions in opposition to Defendants' motion.  (See Docket Nos. 29, 30, 33.)

## II. BACKGROUND

### A.      Procedural History

Plaintiff's Complaint was entered on the docket on September 15, 2004.  Because Plaintiff was granted *in forma pauperis* status, his Complaint was screened pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a).  As a result of this screening process, this Court determined that Plaintiff could proceed only on his denial of medical care and excessive force claims against the defendants listed in the caption.  Defendants filed the instant Motion for Summary Judgment on February 21, 2006.  After full briefing, this Court took the motion under advisement without oral argument.  The facts underlying Plaintiff's claim are discussed below.

### B.      Facts

At all times relevant, Plaintiff was an inmate incarcerated with the DOCS and housed in the Wende Correctional Facility.  (Defendants' Statement, ¶ 1.[4])  Defendants, at all times relevant, were employed by DOCS.   (Defendants' Statement, ¶¶ 3-7.) Defendant Bauers is a fully licensed medical doctor who worked at Wende as a fee-for-service physician. (Defendants' Statement, ¶ 3.) Defendants Sedar, Fisher, and DiRienzo are registered nurses who worked at Wende as nurses.  (Defendants' Statement, ¶¶ 4-6.) Defendant Schwedt is a corrections officer assigned to Wende.  (Defendants' Statement, ¶ 7.)

---

[4]Referring to Defendants' Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence.

1.      **Plaintiff's Denial of Medical Treatment Claim**

        a.      **Dr. Bauers' Oversight of Plaintiff's Cancer Treatment**

Dr. Bauers, Plaintiff's physician at Wende, referred Plaintiff to an otolaryngologist named Dr. Beverly Prince.   On August 8, 2002, Dr. Prince examined Plaintiff and discovered a lump on his neck that she suspected was cancerous.   (Defendants' Statement, ¶ 8.) Dr. Prince requested authorization to perform a biopsy on the lump, which was approved by the director of medical services for Wende, Dr. Angel Guitierrez. (Defendants' Statement, ¶ 9.)   Dr. Prince performed the biopsy on October 4, 2002. (Plaintiff's Statement, p. 4 [5]; Defendants' Statement, ¶ 9.)

The material obtained as a result of the biopsy was sent for testing to the Wyoming County Community Hospital.   (Defendants' Statement, ¶ 10.) There, Dr. Jerry Mendlowski, a pathologist, determined that the lump was cancerous.   (Plaintiff's Statement, p. 4; Defendants' Statement, ¶ 10.)   This finding was confirmed by U.S. Labs, an independent laboratory.   The doctor at U.S. Labs, Dr. Robert Stroup, concurred in Dr. Mendlowski's conclusion that Plaintiff had cancer.   (Defendants' Statement, ¶ 10.)

On October 15, 2002, Plaintiff saw Dr. Prince, who explained the diagnosis to him. (Defendants' Statement, ¶ 11.)   Dr. Prince explained to Plaintiff that it was necessary to perform several procedures in order to determine the source of the cancer.   (Defendants' Statement, ¶ 11.)   These procedures were conducted at Wyoming Hospital on December 20 and December 23, 2002, and all biopsies taken were negative.   (Plaintiff's Statement,

---

[5]Referring to Plaintiff's memorandum of law filed in opposition to Defendants' Motion for Summary Judgment.  Given Plaintiff's pro se status, this Court will construe the fact section of this memorandum as Plaintiff's Rule 56 Statement of Facts.

p. 4; Defendants' Statement, ¶ 11.)  Physicians also performed a tonsillectomy on Plaintiff during these procedures based on the discovery of necrotic nodes revealed by a December 12, 2002 CAT scan. (Defendants' Statement, ¶ 11.)  Plaintiff contends that the tonsillectomy was performed without his consent.  (Plaintiff's Statement, p. 4.)

Dr. Prince advised Dr. Gutierrez that Plaintiff should start cancer treatments, despite the fact that the primary source for the cancer had not been located.  (Defendants' Statement, ¶ 12.)  Dr. Gutierrez arranged for Plaintiff to see Dr. Zale Bernstein, an oncologist, who recommended that Plaintiff start a course of chemotherapy.  (Defendants' Statement, ¶ 12.)  Dr. Bernstein also recommended that a mediport be placed in Plaintiff's chest so as to facilitate the chemotherapy treatment.  (Defendants' Statement, ¶ 12.)  Plaintiff initially refused the mediport, but agreed to undergo the procedure after consulting with Dr. Bauers.  (Plaintiff's Statement, p. 6; Defendants' Statement, ¶ 13.)  The mediport was implanted on February 20, 2003.  (Plaintiff's Statement, p. 6; Defendants' Statement, ¶ 13.)  Shortly thereafter, Plaintiff began refusing additional chemotherapy because of the length of the trip to the Erie County Medical Center.  (Defendants' Statement, ¶ 13.)

On February 28, 2003, Dr. Bauers met with Plaintiff and explained to him that all of the evidence suggested that he had cancer.  (Defendants' Statement, ¶ 14.)  Dr. Bauers further explained that Plaintiff's refusal to undergo treatment would most likely result in his death, but he assured Plaintiff that he would support the decision if Plaintiff decided to refuse treatment.  (Defendants' Statement, ¶ 14.)  Plaintiff agreed to undergo further chemotherapy treatment, which was ordered by Dr. Gutierrez.  (Defendants' Statement, ¶ 14.)

Plaintiff underwent three cycles of chemotherapy without incident.[6]  (Defendants' Statement, ¶ 15.)  During the course of his fourth cycle, which was administered on April 28-30, 2003, it was discovered that there was a crack in the mediport tubing that rendered it ineffective and required that it be removed from Plaintiff.  (Plaintiff's Statement, p. 11; Defendants' Statement, ¶ 16.)  Removal of the mediport was delayed, however, after Drs. Bernstein and Bauers determined that it would be safer to remove it when Plaintiff's platelet count increased. (Defendants' Statement, ¶ 17.)

The mediport was thereafter removed on May 28, 2003, and Plaintiff refused to have it replaced.  (Plaintiff's Statement, p. 12; Defendants' Statement, ¶ 18.)  He also refused the final two cycles of chemotherapy, completing five out of the seven cycles. (Defendants' Statement, ¶ 19.)  Accordingly, after May of 2003, Plaintiff received only routine medical treatment, including pain medication, prescription renewal, hearing-aid maintenance, weigh-ins, etc.  (Defendants' Statement, ¶ 20.)  Dr. Bauers then left Wende to take a position at the Attica Correctional Facility on January 9, 2004, and had no further involvement in Plaintiff's case.[7]  (Defendants' Statement, ¶ 25.)

### b.    Nurses Sedar and Fisher's Dispensing of Medication

In October of 2003, Dr. Bauers ordered that the medical staff reduce Plaintiff's dosage of methadone gradually, and discontinue the medication entirely by the end of

---

[6]The first cycle spanned January 27-29; the second cycle spanned February 24-26; the third cycle spanned April 7-9, 2003.  (Defendants' Statement, ¶ 15.)

[7]This Court notes that it previously dismissed Defendants James Doe Pathologist, Dr. Prince, Dr. Bernstein, John Doe, M.D., Wyoming Community Health Center and Erie County Medical Center from this § 1983 case because at best the allegations against these defendants constituted medical malpractice and did not state a § 1983 claim.  (See Docket No. 5.)

December of 2003.[8]  (Defendants' Statement, ¶ 21.)  As a result, nurses Sedar and Fisher no longer had authority to distribute methadone to Plaintiff other than as directed by his doctors.  (Defendants' Statement, ¶ 22.)  When Plaintiff requested methadone beyond what was prescribed, he was required to attend sick call and discuss his request with a doctor.  (Defendants' Statement, ¶ 22.)  Plaintiff alleges that Sedar and Fisher withheld or delayed his medication on numerous occasions.  (Plaintiff's Dep., pp. 69-74.)  Although Plaintiff reported experiencing withdrawal symptoms at the end of December of 2003, he did not exhibit any of the characteristics associated with withdrawal.  (Defendants' Statement, ¶ 23.)  Plaintiff disputes this assertion and claims that he suffered withdrawal symptoms after nurses Sedar and Fisher (and others) delayed or denied him medication.

## 2.     Plaintiff's Excessive Force Claim

Plaintiff alleges that Officer Schwedt assaulted him in the Wyoming Hospital on December 21, 2002, while Plaintiff was recovering from his tonsillectomy and other invasive procedures.  (Plaintiff's Statement, p. 4.)  Plaintiff contends that Officer Schwedt entered his room, stated that he thought someone was smoking, and then grabbed Plaintiff by the neck and struck him several times in the chest.  (Plaintiff's Statement, p. 4; Plaintiff's Dep., p. 15.[9])  Plaintiff testified at his deposition that Officer Schwedt held him by his neck with his left hand and hit him in the chest with the back of his right hand approximately three times.  (Plaintiff's Dep., p. 16.)  Officer Schwedt was allegedly squeezing Plaintiff's neck, but it did not hurt Plaintiff.  (Plaintiff's Dep. p. 17.)

---

[8]Plaintiff was apparently taking methadone because his other medication was addictive. (Plaintiff's Dep., p. 66.)

[9]Excerpts from Plaintiff's deposition are included as Exhibit A to the Gawlik Declaration.

Plaintiff testified that when he objected to Officer Schwedt's actions, Officer Schwedt verbally threatened him.  (Plaintiff's Dep., p. 16.)  When Plaintiff questioned Officer Schwedt's actions, Officer Schwedt allegedly became more agitated and pulled the intravenous tube out of Plaintiff's arm and struck him again twice more with the back of his hand.  (Plaintiff's Dep., p. 18.)  Plaintiff contends that in the course of this attack, Officer Schwedt knocked food, linens and clothing onto the floor, which was observed by hospital staff.[10]  (Plaintiff's Dep., p. 19; Plaintiff's Statement, p. 4.)

### III. DISCUSSION

Defendants have moved for summary judgment on Plaintiff's claims.  Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest.  See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  This is especially important when reviewing pro se Complaints alleging civil rights violations.  See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001).  As Plaintiff is proceeding pro se, this Court has considered his submissions and arguments accordingly.

As a threshold matter, Defendants argue that Defendant DiRienzo is entitled to summary judgment because there is no evidence that she was personally involved in the alleged constitutional violations.  Defendants further argue that they are entitled to summary judgment on Plaintiff's denial of medical care and excessive force claims

---

[10]A more detailed recitation of this event is set forth below in the discussion of Plaintiff's excessive force claim.

because Plaintiff has failed to establish violations of his Eighth Amendment rights.  Finally, Defendants argue that they are entitled to the protections of qualified immunity.  Each of Defendants' arguments is addressed below.

## A.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56 (c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248.  In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

At this stage, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Thus, summary judgment is not appropriate if "there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Ford, 316 F.3d at 354.

When deciding a motion for summary judgment, a court must view the evidence and

the inferences drawn from the evidence "in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).   However, the party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

## B.   Personal Involvement

Personal involvement in the deprivation of federal constitutional rights is the *sine qua non* of liability under § 1983.  See Haygood v. City of New York, 64 F.Supp.2d 275, 280 (S.D.N.Y. 1999).  Moreover, it is well settled in this Circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.  See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F.Supp.2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).  The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Defendants argue that Defendant DiRienzo must be dismissed because Plaintiff has

testified that she was not involved in the alleged denial of medical treatment.  Indeed, in his deposition, Plaintiff stated that "I don't want to sue her" when asked what his claim was against Defendant DiRienzo.  (Plaintiff's Dep., p. 70.)  He also stated, "I want to take her off.  She is not responsible."  (Plaintiff's Dep., p. 75.)  Accordingly, this Court will dismiss Defendant DiRienzo from this case.

**C.      Eighth Amendment Claim: Denial of Medical Treatment**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)).  Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140.  Here, Plaintiff's § 1983 denial of medical treatment claim is grounded in the Eighth Amendment.

The Eighth Amendment to the United States Constitution applies to the States through the Fourteenth Amendment, and "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."  Wilson v. Seiter, 501 U.S. 294, 297, 11 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); U.S. Const. amend. VIII.  As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment.  See DeShaney v. Winnebago County Dept. of Social Svcs., 489 U.S.

10

189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989).   In addition, the

Supreme Court has recognized that a prisoner's claim that he was intentionally denied

medical treatment is cognizable under the Eighth Amendment and § 1983:

> We therefore conclude that deliberate indifference to serious
> medical needs of prisoners constitutes the unnecessary and
> wanton infliction of pain proscribed by the Eighth Amendment.
> This is true whether the indifference is manifested by prison
> doctors in their response to the prisoner's needs or by prison
> guards in intentionally denying or delaying access to medical
> care or intentionally interfering with the treatment once
> prescribed.   Regardless of how evidenced, deliberate
> indifference to a prisoner's serious illness or injury states a
> cause of action under § 1983.
> . . .
>
> In order to state a cognizable claim, a prisoner must allege
> acts or omissions sufficiently harmful to evidence deliberate
> indifference to serious medical needs.   It is only such
> indifference that can offend evolving standards of decency in
> violation of the Eighth Amendment.

Estelle v. Gamble, 429 U.S. 97, 104, 106, 97 S.Ct. 285, 291, 292, 50 L.Ed.2d 25

(1976)(quotations and citations omitted).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment

has two components--one subjective, focusing on the defendant's motive for his conduct,

and the other objective, focusing on the conduct's effect." Sims v. Artuz, 230 F.3d 14, 20

(2d Cir. 2000) (citing Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S.Ct. 995, 999, 117

L.Ed.2d 156 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)).   With respect

to a claim of deliberate indifference to a serious medical need, a prisoner must show that

he suffered from a "sufficiently serious" medical condition, see Chance v. Armstrong, 143

F.3d 698, 702 (2d Cir. 1998), and that the defendants acted with a "sufficiently culpable

state of mind," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Sims, 230 F.3d at 21 (citations omitted).   The objective component is "contextual and responsive to contemporary standards of decency." Id. (quoting Hudson, 503 U.S. at 8).

> "An official acts with the requisite deliberate indifference when he 'knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"

Brown v. Picarelli, No. 96 Civ. 1222, 2003 WL 1906180, at *6 (S.D.N.Y. Apr. 15, 2003)(quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).

This Court has reviewed the extensive medical records and other evidence submitted by the parties.  Based on that review, this Court finds that Plaintiff has failed to demonstrate the existence of any genuine issue of fact regarding his Eighth Amendment denial of medical treatment claims.  Even viewing all of the evidence in the light most favorable to Plaintiff, this Court finds that Plaintiff's claims fail.

Plaintiff's claim against Dr. Bauers is that Dr. Bauers unnecessarily treated him for cancer when, in fact, he was not ill.  (Plaintiff's Complaint, p. 18.)  Plaintiff contends that Dr. Bauers' motivation for treating him was "an elaborate scheme to run up large bills with the state by giving unnecessary treatment."  (Plaintiff's Complaint, p. 18.)  Even assuming the truth of Plaintiff's contention that he did not have cancer at the time Dr. Bauers treated him, which is not supported by the record, it is undisputed that all available medical

12

evidence strongly suggested that Plaintiff had cancer somewhere in his body. Drs. Prince, Bauers, Gutierrez, Mendlowski, Stroup and Bernstein all operated under the educated assumption that Plaintiff had cancer. In fact, Plaintiff admits that Dr. Bauer thought he had cancer. (Plaintiff's Dep., p. 65.) Based on this assumption, the actions taken to confirm and treat Plaintiff's cancer were justifiable and reasonable, and Plaintiff does not argue otherwise.

Plaintiff's real claim is that he should not have undergone treatment at all because he did not, in fact, have cancer. However, all of the evidence suggested that Plaintiff *did* have cancer and in that context, Plaintiff has not presented any evidence that Dr. Bauers acted unreasonably. While Plaintiff contends that Dr. Bauers should have gotten a second opinion, this Court notes that prisoners are not entitled to treatment of their choice, and in any event, five other doctors also confirmed Dr. Bauers' belief that Plaintiff had cancer. Accordingly, Dr. Bauers' ordering of cancer treatment for Plaintiff was reasonable in light of the medical evidence, and, in any event, Plaintiff voluntarily underwent the treatment and was at no time forced to do so. Indeed, Plaintiff refused the replacement mediport device and elected not to complete his prescribed course of chemotherapy. When Plaintiff's claim is boiled to its essence, he claims that he was misdiagnosed with cancer, which raises a medical malpractice claim, not a § 1983 claim. See Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986).

Moreover, Plaintiff cannot demonstrate that Defendant Bauers acted with a sufficiently culpable state of mind to meet the deliberate indifference standard. See Hathaway, 37 F.3d at 66. To the contrary, the record contains evidence that demonstrates that Plaintiff received immediate and continuing medical treatment of a serious medical

13

condition that doctors thought Plaintiff had – cancer.  Defendant Bauers and the other doctors evaluated Plaintiff's medical condition, ordered tests to confirm their diagnosis of cancer, and then treated the cancer accordingly.  Again, while the source of Plaintiff's cancer was apparently never found, Plaintiff has presented no evidence to support his contention that he does not have cancer.  Defendant Bauers clearly was not indifferent to Plaintiff's medical needs.  In any event, Plaintiff's own allegations preclude a finding that Defendant Bauers was motivated by a culpable state of mind or intent to deliberately injure Plaintiff because he states that Defendant Bauers was engaged in a scheme to "run up large bills with the state."  Based on the record evidence, no reasonable trier of fact could conclude that Defendant Bauers knew of and disregarded a serious medical condition that presented an excessive risk to Plaintiff's health or intentionally subjected him to objectively unnecessary medical treatment.[11]  See id.

Plaintiff's claim against nurses Sedar and Fisher is that they improperly withheld medication from him, which caused him to suffer withdrawal symptoms.  The record evidence, however, contradicts Plaintiff's allegations.  Dr. Bauers instructed medical staff to gradually reduce and then discontinue Plaintiff's receipt of methadone.  (Sedar Decl., ¶ 6.)  The plan to reduce the methadone was implemented to avoid Plaintiff suffering withdrawal symptoms.  (Sedar Decl., ¶ 6.)  Nurses have no authority to dispense medication other than in conformity with doctors' orders.  (Sedar Decl., ¶ 9; Fisher Decl., ¶ 5.)  Nurses Sedar and Fisher administered Plaintiff's medications as instructed.  (Sedar

---

[11]It is worth noting that during his deposition, Plaintiff stated that he did not want to sue Dr. Bauers, but rather, wanted him to testify in his case.  (Plaintiff's Dep., p. 64.)  Plaintiff's chief complaint against Dr. Bauers is that "he didn't listen to me," but rather, thought that Plaintiff was in denial about his cancer.  (Plaintiff's Dep., pp. 65-66.)

Decl., ¶ 5; Fisher Decl., ¶¶ 7-8.)  The reduction in Plaintiff's receipt of methadone was therefore deemed to be medically necessary, and the nurses did not act with wanton disregard to Plaintiff's medical needs.  Moreover, although Plaintiff contends that he experienced withdrawal on December 22, 2003, there is no medical evidence suggesting that Plaintiff ever experienced withdrawal symptoms, despite being examined by Dr. Bauers therefore.  (Sedar Decl., ¶ 7.)

Furthermore, Plaintiff's claim that nurses Sedar and Fisher denied him medication does not meet either the objective or subjective component of an Eighth Amendment claim. Plaintiff offers no evidence that he suffered a serious injury as a result of Sedar and Fisher's actions, nor does he present any evidence from which it could reasonably be inferred that they acted with a sufficiently culpable state of mind.  Plaintiff's medication records establish that he was administered medication consistent with his doctors' orders.[12]

Accordingly, for the reasons stated above, this Court finds that Defendants are entitled to summary judgment on Plaintiff's claim that he was denied adequate medical treatment in violation of his Eighth Amendment rights.

**D.    Eighth Amendment Claim: Excessive Force**

As noted above, the Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."  Wilson, 501 U.S. at 297.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being."  Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d

---

[12]Plaintiff's medical records are attached to the Bauers and Sedar Declarations, as well as Plaintiff's opposition papers.

22 (1993) (quotation and citation omitted).   Part of the state's duty is to protect inmates from punishments that are "totally without penological justification."   See Williams v. Fitzpatrick, No. 03 CV 11, 2006 WL 1889964, at *2 (D.Vt. July 10, 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Plaintiff's Eighth Amendment excessive force claim is evaluated under a similar two-prong inquiry as is applicable to Plaintiff's denial of medical care claim discussed above. See  Warren v. Chakravorty, No. 03 Civ. 8736, 2006 WL 2067736, at *7 (S.D.N.Y. July 25, 2006).   That is, both an objective and subjective prong must be satisfied.   To meet the objective prong, the alleged violation must be "sufficiently serious" by objective standards. Farmer, 511 U.S. at 834.   To meet the subjective prong, the inmate must show that the prison officials involved had a wanton state of mind when they engaged in the misconduct. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (quoting Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994)).

However, de minimus use of force is excluded from constitutional recognition, "provided that the use of force is not of a sort repugnant to the conscience of mankind." Green v. Morse, No. 00-CV-6533, 2005 WL 1490301, at *2 (W.D.N.Y. June 23, 2005) (quoting Hudson, 503 U.S. at 9-10).   "Punishments incompatible with the evolving standards of decency that mark the progress of a maturing society or involving the unnecessary and wanton infliction of pain are repugnant to the Eighth Amendment."   Id. (alterations omitted).

The Second Circuit has explained an excessive force claim as follows:

> The malicious use of force to cause harm constitutes an Eighth
> Amendment violation per se whether or not significant injury is
> evident.   This result follows because when prison officials

> maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. Nevertheless, a *de minimus* use of force will rarely suffice to state a constitutional claim.  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

Griffin v. Crippen, 193 F.3d at 91 (citations and internal quotations omitted).  Thus, "even if the harm inflicted is not significant, if plaintiff can show malicious intent then the objective prong will [ ] almost always be satisfied."  Green, 2005 WL 1490301, at *3.

As noted, Plaintiff alleges that Defendant Schwedt used excessive force against him in violation of his Eighth Amendment rights.  Defendants do not offer any evidence to refute Plaintiff's version of events, such as an affidavit from Defendant Schwedt or any witnesses.  In fact, they present no evidence on this claim at all.   Rather, they argue that even assuming the truth of Plaintiff's allegations, his Eighth Amendment rights were not violated.  This Court sets forth below the complete recitation of this event from Plaintiff's deposition[13] because examination of the full set of facts is necessary to determine whether Defendant Schwedt's conduct is *de minimus* as Defendants argue.[14]  The excerpt begins from when Defendant Schwedt entered Plaintiff's hospital room where Plaintiff was recovering from surgery.

> Atty. Gawlik: When [Officer Schwedt] came in, what did he say exactly?
>
> Plaintiff:      He said somebody's been smoking.

---

[13]This Court has not been provided with the complete transcript of Plaintiff's deposition.  Only excerpts have been provided.

[14]Plaintiff's testimony, even if it is the only evidence he can produce, is sufficient evidence to defeat summary judgment and proceed to trial.  See, e.g., Griffin, 193 F.3d 91-92 (reversing district court's granting of summary judgment where the plaintiff's testimony was the only evidence).

17

Q.          What was your response?

A.          Yes.

Q.          Then what did he say?

A.          He just knocked everything - - he walked straight in.

Q.          He walked straight in and he said, someone's been smoking and he knocked everything off?

A.          I had a tray of food.

Q.          Okay.

A.          And he knocked it off and onto the floor.  Now, I understand, you know - - I'm to myself, like I know you wanted to do your job, this is another thing, that's above and beyond.  He knocked everything on the floor.  I just looked at him. He's like I'm telling you and, you know, I'm like - -

Q.          Okay.  And when you said he hit you.  Can you describe how he - -

A.          He held me by the neck.  He was going like I'm telling you.  He was hitting me with the back of his hand.

Q.          How did he have your neck, can you describe it? Did he have one hand or two hands around your neck?

A.          Like that.

Q.          So you're saying it looked like with his right hand, he had one hand around your neck?

A.          His left hand on my neck, like that.  He was going like, I'm telling you.

Q.          You're motioning as he was hitting you with the back of his hand?

18

A.      With his right hand.

Q.      Where did he hit you with the back of his hand?

A.      In the chest.

Q.      How many times did he do that?

A.      About three, a couple of times.

Q.      And then you said he said something to you. Describe what happened from there.

A.      He said, I'm from Attica, I don't take no shit.  He said, I don't care how old you are,[15] how sick you are, I will fuck you up.

Q.      Okay.

A.      I asked him, so you mean to tell me, you came in here and you didn't catch anybody smoking, you think you smell smoke, you're not going to write me up, you're going to fuck me up.  I said, is that what they're teaching at the academy now. That's what really set him off.

Q.      Did he have his hand around your neck?

A.      When I was talking, yes.

Q.      Was he squeezing?  Was he physically hurting you with his grip?

A.      He was squeezing.  He was holding on.

Q.      Was he choking you?

A.      Sort of like choking.

Q.      Was he really - - was it hurting you?  I mean, was it physically hurting you?  Was he holding you or was he actually trying to choke you?

---

[15]Plaintiff was 50 years old at the time of this incident.

19

A.    It was like a choke.   The reason he didn't actually hurt me is because, you know, I'm kind of callous.  So, you know, I could take it a little bit more than the average person.  They wouldn't have been able to talk.

I just felt like, you know, for an officer, you know, to come in like that.  I have seen an officer straighten out matters and use force and everything when it was needed, but just to come in and go off like that.  I don't know what happened to him at home, you know, or what was on his mind but to come in like that.  He just went berserk.

Q.    All right.  Now, after he hit you with the back of his hand three times, you said you stated something to him, then exactly what happened? What did he do after you told him that?

A.    He went off again.

Q.    How did he go off again?

A.    Because I told him that you came in here, you didn't catch anybody smoking, you think you smell smoke, so you're not going to write me up, you're going to fuck me up.  I said, is that what the academy is teaching right now.  He said I'm telling you and he pushed me and pulled the IV out of my arm.

Q.    How did he hit you that time, was it with the back of his hand again?

A.    He went like that, but then he pushed me.

Q.    So he hit - - you already said that he hit you about three times with the back of his hand?

A.    Yes, sir.

Q.    After you made your statement, how many more times did he hit you?

20

A.      I would say two.

Q.      Was his hand on your throat?

A.      The other hand was still on my throat.

Q.      And then you said he pushed you.  I'm assuming he let go of your throat?

A.      He let go of my throat.  He pushed me with two hands.  Now, as for the IV being pulled out, I'm assuming that he pulled it out, but his hand could have got in it and pulled it out.

Q.      But his actual hand was on the IV?

A.      Yes.  When the IV came out, medical staff, you know - - it summons the medical staff.  So, they came into the room and they seen all the stuff on the floor.  They were asking what did you do in here.  Well, he didn't have time to leave because he was still in the room.  I said - - I'm going to be honest with you in just what I said.  I said, White[16] didn't do a fucking thing, that mother fucker did all that shit right there.

They stood right there and they looked at him. He couldn't deny it.  They waited a few minutes and the nurse is telling me, well, you know, the doctor wants you to have this, why did you remove your IV.  I said, I didn't remove my IV, that mother fucker removed my IV.

I said, as a matter of fact, he grabbed me by the back of my neck and hit me in the chest a couple of times.  I said I had surgery yesterday and I think I need to be examined, and the nurse went into a panic.

(Plaintiff's Dep., pp. 15-19.)

---

[16]This Court assumes that Plaintiff is referring to himself, Ulysses White, by this reference to "White."

Defendants' opposition to Plaintiff's claim rests entirely on the argument that even assuming the truth of Plaintiff's allegations, Officer Schwedt's actions constitute a *de minimus* application of force.  Applying the Eighth Amendment excessive force framework discussed above, this Court has little difficulty rejecting Defendants' argument.

First, force is considered *de minimus* if it is "not of a sort repugnant to the conscience of mankind."  Green, 2005 WL 1490301 at *2 (quoting Hudson, 503 U.S. at 9-10).  In this Court's view, a fact-finder crediting Plaintiff's testimony could reasonably find that Officer Schwedt's attack on the 50-year-old Plaintiff while he was lying in a hospital bed recovering from an invasive medical procedure, and which included him choking Plaintiff, hitting and pushing Plaintiff several times, and pulling Plaintiff's intravenous tube out, is an exercise of force that is repugnant to the conscience of mankind.  A jury could reasonably find that Officer Schwedt's actions went beyond a "push or shove," and instead, constituted malicious conduct that violated contemporary standards of decency.  Griffin, 193 F.3d at 91.

Second, on the objective inquiry of the two-prong analysis, this Court finds that a reasonable fact-finder crediting Plaintiff's testimony could find that Officer Schwedt's actions were sufficiently serious.  This is particularly true in light of the conclusion articulated below that a fact-finder could reasonably find that Officer Schwedt acted maliciously or sadistically.  Such a finding obviates the need for Plaintiff to establish a serious violation on the objective prong.  See Green, 2005 WL 1490301, at *3 ("even if the harm inflicted is not significant, if plaintiff can show malicious intent then the objective prong will [ ] almost always be satisfied"); Griffin, 193 F.3d at 91 (malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant

injury is evident).

Third, the subjective inquiry requires this Court to determine whether there is evidence from which it could be concluded that the prison officials involved had a wanton state of mind when they engaged in the misconduct.  See Davidson, 32 F.3d at 30.  Put another way, the "core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Warren, 2006 WL 2067736, at *7 (quoting Hudson, 503 U.S. at 6-7).  Plaintiff's testimony, if credited by the fact-finder, could support a finding that Officer Schwedt acted maliciously or sadistically with an intention to cause Plaintiff harm.  Defendants do not challenge Plaintiff's testimony and offer no explanation whatsoever for Officer Schwedt's conduct, which strikes this Court as wholly unrelated to any legitimate penological interest.

Plaintiff testified that he was lying in a hospital bed recovering from surgery when Defendant Schwedt attacked him without provocation and destroyed his room.  Plaintiff's testimony that Officer Schwedt pulled out his intravenous tube and told him that he did not care how ill or how old he was is evidence from which a fact-finder could infer that Officer Schwedt acted with malice and with intent to injure Plaintiff.  See, e.g., Warren, 2006 WL 2067736, at *7 (evidence that a defendant pulled on a neck brace could support a finding of malice and intent to injure).  Even straining to assume that Officer Schwedt was attempting to enforce a "no smoking" rule, his overreaction and the viciousness of his attack on the defenseless and prone Plaintiff weighs heavily against a finding that his actions were de minimus or were a good-faith effort to discipline Plaintiff such that summary judgment in Defendants' favor is warranted.

Accordingly, for the reasons stated above, this Court finds that Defendants are not

23

entitled to summary judgment on Plaintiff's claim that Officer Schwedt used excessive force against him in violation of the Eighth Amendment.

## E.     Qualified Immunity

Defendants argue that, even assuming that there were constitutional deprivations of Plaintiff's right to medical treatment and right to be free from the application of excessive force, they are entitled to qualified immunity.  Officials are protected from § 1983 liability on the basis of qualified immunity if their actions (1) did not violate clearly established law or (2) it was objectively reasonable for the officials to believe that their actions did not violate the law.  See Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999).

As discussed above, this Court finds that Defendants' medical treatment of Plaintiff was reasonable.  Moreover, it is objectively reasonable to conclude that Defendants believed that their own actions were reasonable:  they suspected that Plaintiff had cancer; they confirmed this diagnosis and evaluated Plaintiff's condition; and they provided Plaintiff appropriate ongoing medical treatment for the medical condition that they thought he had, including medical procedures and medication.  They administered medications to Plaintiff pursuant to physicians' orders and followed protocol when Plaintiff requested medication that was not prescribed or not otherwise authorized to be administered.  Accordingly, this Court finds that even assuming the existence of a constitutional violation, Defendants are entitled to qualified immunity on Plaintiff's claim that he was denied adequate medical care.

For reasons already stated, Defendant Schwedt is not entitled to qualified immunity at this stage.  From the evidence presented to this Court, Defendant Schwedt has not established that (1) he did not violate clearly established law or (2) it was objectively

24

reasonable for him to believe that his actions did not violate the law.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants Bauers, Sedar and Fisher are entitled to summary judgment and qualified immunity on Plaintiff's denial of medical care claim. Defendant Officer Schwedt is not entitled to summary judgment or qualified immunity on Plaintiff's excessive force claim. Finally, Defendants John Doe, R.N., and D. DiRienzo, R.N., are dismissed from this case**.**

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 18) is GRANTED in part and DENIED in part consistent with this Decision and Order.

FURTHER, that Defendants John Doe, R.N. and D. DiRienzo, R.N. are DISMISSED from this case.

FURTHER, that Plaintiff and counsel for Defendant Officer Schwedt shall appear before this Court for a status conference on November 2, 2006, at 9:00 a.m..

FURTHER, that Plaintiff shall appear at the status conference by telephone.

FURTHER, that counsel for Defendant Officer Schwedt shall arrange for the correctional facility to provide Plaintiff with access to a private phone line at that time.

FURTHER, that counsel for Defendant Officer Schwedt  shall contact this Court's Courtroom Deputy at (716) 332-7824 three days prior to the conference and provide a

direct phone number at which Plaintiff can be reached for purposes of the status conference.   This Court will initiate the telephone call to Plaintiff to begin the status conference.


      SO ORDERED.

Dated:      September 21, 2006
             Buffalo, New York


                              /s/William M. Skretny
                             WILLIAM M.  SKRETNY
                         United States District Judge